Associate Professor, the College of Educational Sciences If a baby is born at 18 weeks gestation, it is too young to survive, but the standard of care is to swaddle that baby and provide pain medication for comfort. If that same 18-week baby is still inside the womb, a doctor can rip its limbs off with It's illegal to kill an animal that way in Texas. We wouldn't execute a murderer that way. And notably, abortion providers don't tell women that that's what the procedure entails. The Texas Legislature decided to limit these brutal abortion procedures and SBA by simply requiring that they not be performed on a living unborn child. The District Court erred in facially invalidating the law because there are alternative second and that the plaintiffs already use and tell their patients are safe. There is no evidence that the law will burden abortion access for a large fraction of women. The Supreme Court held in Gonzales v. Carhartt that the state may prohibit brutal and inhumane abortion procedures to further its interest in respecting fetal life. This case is a straightforward application of that precedent. Here, as in Gonzales, there is no substantial obstacle because there are safe alternative procedures available which allow second trimester abortions to be performed. Notably, SBA does not prohibit all D&E abortions. D&E abortions are generally performed between 15 or 16 weeks and 22 weeks gestation, which is the legal limit for abortion in Texas. SBA merely prohibits intentionally causing the death of the fetus with forceps. There are several ways that abortion doctors can comply with the law. The record shows that suction can be used to achieve the death of the fetus up until 17 weeks gestation and that does not violate the law. Performing the dismemberment procedure is permitted under SBA if the fetus is already dead and there are several ways that doctors can cause fetal demise. First with injections of a certain drug, either digoxin, which is in widespread use by abortion providers, including some of the plaintiffs, or potassium chloride, which is commonly used to reduce multiple pregnancies. Ms. Hacker, what are we to make of the 11th Circuit's recent opinion? Were they wrong? Was it driven by a distinctive sort of factual record? Are there wording differences between the Alabama law and the Texas law that compelled a different outcome? What do we make of the recent 11th Circuit case? Well, the summary, Your Honor, is that that case has an extremely different factual record. The law at issue in that case is basically the same as the Texas law, but the factual issues require a different result. In that case, the state, the court did not consider intrafetal digoxin, which is more of a herniatic digoxin, and in Texas, intrafetal digoxin is what is normally used. Another major factual distinction is that the plaintiffs in that case were the only two abortion providers in the state of Alabama, and they did not already use digoxin. Here, the plaintiffs have all used digoxin. Some of them currently use digoxin, and the others recently used digoxin, and this was on a routine basis. Another factual distinction is that the state only offered up intracardiac KCL or potassium chloride as an alternative, and here the state is arguing and showed evidence in the record that intrafetal potassium chloride is just as effective and can be used and is not as complicated of a procedure to perform. In fact, one of the plaintiff's experts admitted that doing an intrafetal potassium chloride injection is the same procedure as doing an intrafetal digoxin injection, which the plaintiffs can already do. We said in June Medical recently that the phrase large fraction is a little slippery, ambiguous. There's uncertainty about where to take the large fraction snapshot. What is the state's view on how that should be formulated and why? So the large fraction, I think the court in June Medical gave sort of two options, and the first option I think is most applicable in this case. The denominator would be the actual number of women affected by the law, and the numerator would be those who are actually burdened by the law or those who have a substantial or, excuse me, those who are actually burdened by the law. And so translating that into this case, as I already stated, the record shows that up to 17 weeks, the death of the fetus can be accomplished through section. The number of women that received a second trimester abortion between 17 and 22 weeks of gestation in 2015 was 1,630 women, and that would be the denominator. Now the numerator, the number of women actually burdened, there's no evidence in the record to quantify that number. If we are only looking at digoxin as an example, assuming a 2% failure rate, which is what Dr. Wallace testified to in court in her personal experience and practice, another one of the said that she had no failures in 2015, but assuming a 2% failure rate after two digoxin injections, there would be less than one woman that would still have a live fetus at that point. And that excludes the fact that there are still other methods for causing fetal demise available at that point, intrafetal, KCL is one option, transecting the umbilical cord is another option, if those options fail, the woman could be referred to a specialist to do an intracardiac injection of potassium chloride, which works almost instantly. So it's purely speculative that after all of those options, that one woman would still be unable to receive an abortion. There's no evidence in the record to quantify the other burdens that the plaintiffs named, such as fibroids or poverty. The record shows that the idea that there would be a woman that would not be able to receive these injections would be exceedingly rare. Dr. Wallace testified that there was only one such case she could remember in all of her practice, and Dr. Berry, who routinely performs potassium chloride injections in his practice, said that he has never not been able to perform the injections. Does the record shed any light on the development or the prevalence of the other fetal demise methods since Gonzales 11 years ago? Yes. Digoxin was not frequently used prior to Gonzales, but after Gonzales, it became the standard. Notably, Planned Parenthood mandated its use in all abortions over 18 weeks, and that standard changed over time. But many abortion doctors began using digoxin, first, to comply with the partial birth abortion ban, and secondly, to avoid legal liability for potential live births. So abortion providers all over the country were using digoxin. It's been well studied. Abortion providers in Texas use digoxin for those reasons. And those reasons are legal reasons. They're not required to use digoxin. They chose to do it. So in their own evaluation, this procedure is very safe. They tell their patients it's safe. It's very low risk, because they have weighed the costs and benefits and decided to go ahead and use that procedure in situations where they were not required to. Are you saying it's not experimental anymore?  Pardon me? It's not experimental anymore? No, Your Honor. It is not experimental. It has been very well studied. And aside from the wide practice of the doctors in Texas, again, Planned Parenthood is the largest abortion provider in America. They were using it routinely. One of their affiliates even used it to induce fetal demise in all second trimester abortions, which starts at 13 weeks gestation. And this is supported by the record? Yes, Your Honor. Yes, Your Honor. That information can be found in the Planned Parenthood Standards and Guidelines. We referenced that in our brief. Does the record contain the consent forms that state that digoxin is safe? Yes, Your Honor. In the record at 4438 to 43, that's Planned Parenthood's statement to their patients that digoxin is safe. The record at 4327 is Alamo's statement to their patient that digoxin is safe, and the record at 4307 is Southwestern's statement to their patients that digoxin is safe. Abortion providers also stated to their patients that using digoxin makes the procedure safer and easier. Those can be found at the same pages in the record. Is there any disagreement about what you're telling us in the record among experts? The arguments made in this case are contradicted by the provider's statements to their patients. Providers have an ethical obligation to tell their patients the truth, and in this case they were telling their patients that digoxin is safe, that it's effective, that failures are rare, that it makes the procedure safer and easier, it enables them to avoid violating the partial birth abortion ban, all of those things the providers were telling their patients. So that is the most relevant evidence in terms of the providers themselves, their evaluation of these techniques. Potassium chloride is also widely used. It's generally... Before you go on to that one, let me just ask you one other question, back to the West Alabama case. I was trying to find it in there. There was a discussion about the digoxin, is that how you pronounce it? At any event, some discussion about it as an alternative method, but apparently in the record some discussion or testimony about the relative risk of its use creating other issues. Digoxin injections increasing the risk of hemorrhage, infection, and extramural delivery. In other words, that was a position, as I understand it, the state in Alabama was pushing forward. And I got your point about factual differences in the cases, but my question is whether in this record is there competing testimony or whatever about the relative risk or not of using the digoxin as you're mentioning as an alternative or not. In other words, what does the record say? Is it like a lot of this competing testimonies on it? You've stated that since Gonzales more use is done, but the West Alabama case came out in August, so I don't know how much more than that. But I mean the short portion, is there testimony about risk, et cetera, in this record? Well, Your Honor, in this record, we can see that digoxin is actually more safe than the abortion procedure itself. In this record, there were over 300 abortion-related complications reported to the state in the last five years, zero of those complications involved digoxin. One of the experts testified in the case about a study involving over 1,600 patients and found that the rate of infection or extramural delivery was less than 1% in that patient population. And once again, the plaintiffs are already using digoxin even though they're not required to do so. They tell their patients it's safe and they tell their patients it's low risk. That was not the case in the Alabama court because those doctors were not using digoxin at all. When you say the providers are doing this, how many are you talking about? What percentage? What percentage of? Of women getting abortions in Texas? So only three. Are we talking about the lower income women who have to, as I understand it, it's much more burdensome for them to come, you have to come two or three times and wait and so forth and incur all these risks. Who are we talking about here? Which women? How many? Well, that's a good question, Your Honor, because the number of women who would be seeking this type of abortion that are low income and who would be potentially burdened by that type of instance has not been quantified in this record. The plaintiff's expert sociologist could not give a number as to how many of these women or how many of these patients at these plaintiff clinics are low income such that it would be a burden on them. Ms. Hacker, the state argues that the district court applied the wrong legal test, but the relief you're seeking is just outright reversal. I guess alternatively a narrowed injunction, but you're seeking outright reversal rather than remanding for application of what the state believes is the correct legal test. So can you step me through that? Yes, Your Honor. I see my time is almost up. Well, let me stop you. Madam Clerk, give her an additional five minutes. I cut you off from going to potassium chloride and you got a heavy-duty question here. You know, we're not rushing. We want to get it right. So give her five. We'll put five on the other side. So you can, don't rush through your answer and you can come back to potassium chloride, but go ahead and answer his, but we'll get through it. All right? Yes, Your Honor. The state does not need to remand to the district court for any additional fact findings. The record is full. It would be useless. Under the Pullman standard versus Swint standard, if the outcome, if there's only one possible outcome, there's no need for a remand, and in this case, it's very clear that the evidence put forth by the plaintiffs does not establish that a large fraction of women in Texas will be, will face a burden, an unconstitutional burden on their abortion access. So that's something this court can just determine right away. Turning to potassium chloride, that procedure is commonly used to reduce multiple pregnancies by specialists. Now, it's important to note that that doesn't mean that only specialists can do this procedure, which is what the plaintiffs have been trying to give the impression of. The expert in this case who routinely performs these injections says that intrafetal potassium chloride is just as effective and causes the death of the fetus within a few minutes, and any doctor who can perform a intrafetal digoxin injection can also perform an intrafetal KCL injection. There is also testimony in the case from one of the plaintiff abortion doctors, or abortion doctors from one of the plaintiff organizations, excuse me, that any, in her opinion, any competent provider of DNA abortions can learn to do these injections if they don't already know how to do them. The other, the other potential method for causing fetal demise is umbilical cord transection. That is less studied, but Planned Parenthood lists that as a possible option in its guidelines for causing fetal demise, both just on its own and in the alternative if a digoxin failure happens in that rare occurrence. Well, on that one, I ask you a similar question. I ask you about the digoxin. The Alabama case talked about the umbilical cord transection raises the risk of hemorrhage, uterine infection, and injury. So my question is, in this record, is there testimony about the relative risk or not about that alternative? In this record, there were at least two abortion doctors that said that they had actually transected the umbilical cord in a procedure themselves in Texas. There was also testimony in this case of a study that was performed by a Planned Parenthood affiliate where they transected the umbilical cord to cause fetal demise in all patients over 16 weeks gestation in their clinic with a 100% success rate, and the study author said that this should be looked at as an alternative to using digoxin to cause fetal demise. Are there other alternatives beyond the ones that you mentioned that weren't in either of these other cases or are in this case? So the testimony was less developed, but it was also mentioned that fetal demise can be caused through other means. You can use lidocaine, which is a common local anesthetic. You could even inject the fetus with air. Those were other potential methods that were suggested by the maternal fetal medicine specialist who testified in this case. It's important to note also that here the law has a medical exception. So if we got to the point, the extremely speculative point, that there would be a woman for whom all of these methods would have failed and they were at a point where they were in medical danger, the law allows the doctor to go ahead and perform that procedure if there's a substantial risk of major harm to that woman. What are we to make of the seeming, I don't know if borrowing is the right word, but of the district courts, some facts and factual conclusions that seem to be quite similar may be driven by the records in other cases and not this case. That should cause the court to question the veracity of the fact findings and the support of the fact findings made by the district court in this case. That was improper. And in many instances, as we noted in our brief, not only did the district court cut and paste from records that were different than this one and reference facts that were not in this record, but also he ignored facts in the record that were related to important issues in the case, suction being a major point that the district court completely ignored, the fact that suction can be used to cause fetal demise up to 17 weeks gestation. Another point that the district court completely ignored was that the plaintiffs already due to Jackson. That didn't come out at all in the opinion. So those things should lead the court to view the fact findings of the district court as clearly erroneous because they were not supported by the record in that case. There's no question that the state's interest in respecting fetal life is supported by this restriction. And Texas is one of nine states in the country that moved to prohibit this procedure. As you've already noted, Alabama is the first one in line and is going to be filing a cert petition very soon. I see my time is up. Thank you. Thank you, Ms. Hacker. You've preserved rebuttal time. All right. We hear from the LP, Ms. Apelli Kreps. Good morning. May it please the court, Janet Kreps for the Apple East Texas Abortion Providers. In Stenberg v. Carhart, the Supreme Court held the law prohibiting performance of D&E procedures on a living fetus imposed an undue burden. The court granted facial relief and enjoined the law in its entirety. In reaching this holding, the court acknowledged that physicians could cause fetal demise via a separate medical procedure prior to the performance of D&E and still held the law unconstitutional. There is no basis on which to reach a different conclusion in this case where the law bans D&E procedures, the most common method of abortion, after approximately 15 weeks. The state's proposed methods of fetal demise do not alleviate the undue burdens imposed by SB 8. The district court's findings that none of the proposed methods are feasible are supported by a robust evidentiary record in this case and not clearly erroneous. That record shows that the state's proposed means of demise are invasive, medically unnecessary, and pose additional significant health risks to women. Although the Texas law requires demise before every D&E, the evidence shows that no method of demise works in every case, leaving physicians with no way to safely proceed with a D&E procedure. Can a state legislate abortion based on a governmental interest beyond health? Can there be valid non-health-related reasons? Yes, Your Honor. The Supreme Court made clear in Casey that the state may regulate based on its interest in potential life. However, it's also clear that it's the same undue burden standard and the same balancing test clarified by this court in Whole Woman's Health that applies regardless of the interests underlying the restriction. Can a restriction be a burden without being a substantial obstacle? It can, Your Honor, but in order to make that assessment, the court needs to look at the burdens that have been established, evidence that shows that the restriction actually furthers the state's interests that they're putting forth in support, balancing those interests, and if the burdens outweigh the benefits, then the burdens are undue and the law should be found unconstitutional. I'd like to address briefly a question that came up about whether the Eleventh Circuit decision and the factual record in that case is different from the evidence here in a way that would dictate a different result, and I think that the Eleventh Circuit's decision is consistent with Stenberg and that there is no basis on which to reach a different result here, and specifically, looking at the Eleventh Circuit record, the district court found, and the Eleventh Circuit approved these findings, that the methods of demise, the same methods of demise that the state is proposing here, are not feasible, that the demise procedures impose substantial obstacles on women seeking abortions, and that the burdens far outweigh any benefits, and therefore, the law imposed an undue burden. Ms. Hacker mentioned several times some of the plaintiff provider's own statements about digoxin injections being safe and being low risk, and some of the provider's own routine use of digoxin, and what's your response to that? Your Honor, the evidence in the record is indisputable that providing digoxin is not an additional medical procedure on top of the standard D&E that comes with medical risks, including extramural delivery, infection, and hospitalization, and I think it's important to bear in mind that digoxin is accomplished by using a three to four inch spinal needle to inject the digoxin into the fetus. It's an invasive, painful medical procedure, and the state, in its arguments throughout this case, fails to appreciate several very important facts about the use of digoxin. First, digoxin is not used prior to 18 weeks. Second, digoxin fails in 5 to 10% of the cases in which it's used, and that the use of a second method of demise, whether it's digoxin or other, is unstudied. In Texas, a minority of women after 18 weeks received digoxin injections, so while it is true that some of the providers do use digoxin, namely Alamo at 18 weeks and Southwestern at 20 weeks, evidence in the court found that 30% of women are getting digoxin after 18 weeks, and 70% are not. Now, providers use suction through 17 weeks, is that correct? No, Your Honor, it's not correct in two ways. First, the evidence shows in the district court found, and this finding is supported by the evidence in the record, that starting at approximately 15 weeks, some providers use forceps rather than suction because they believe that that is the best way to proceed for their patients. The providers are not using suction to cause demise, as the State is now suggesting. That is essentially a method of fetal demise fabricated by the State with no credible evidence to support it, and so the doctors are not using suction up to 17 weeks, and even one doctor who speculated that she may be able to extend to 17 weeks said she did not think suction was possible in every case, and so the State, in making this argument, is essentially arguing against facts in the record and have not established that those facts are clearly erroneous. Is the State correct when they say this? The State is relying on that fact to argue that there are no risks with digoxin to go so far as to say the district court erred in finding that digoxin poses risks when, in fact, the experts on both sides acknowledged that there are the risks of infection and extramural delivery, and the experts on both sides relied on a number of studies looking at digoxin and documenting that these risks are present. Second, one of the physicians in this case Dr. Dermish testified that she has had patients experience extramural delivery following injection with digoxin, and so she has had patients experience one of the complications that the experts agreed is a risk of digoxin. And third, the State's complication reporting forms include an enumerated list of complications that must be reported to the State, but it is not every possible complication that can occur with abortion, and certainly extramural delivery, for example, is not included on that list. So you can't conclude, excuse me, Your Honor, go ahead. No, no, I was going to feel free to wrap up that comment. I was going to move on to another. You can't conclude based on the lack of reported complications in one five-year period that none of the risks of digoxin have occurred, but more importantly, given the number of women, only 30% of the women getting abortions after 18 weeks in Texas, given the relatively small number of women in Texas, you certainly can't conclude that the lack of reported complications mean there are no risks. Those risks are established. What I was going to ask you is what I asked Ms. Hacker earlier, which is, what does the record have to say? Does it shed any light on the prevalence, on the development of some of the technology used in these other three fetal demise methods in the 11 years since Gonzales was decided? Yes, Your Honor, and I think the overall, speaking first of digoxin, the evidence makes clear and is well supported in the record that immediately following the decision in Gonzales, providers, a number of providers, including Planned Parenthood, for a very short period of time, started using digoxin on a regular basis, and that Planned Parenthood, as early as 2011, based on its experience with digoxin and the experience of patients having to undergo digoxin, rescinded that policy and made it optional. Both Dr. Dermish and Dr. Nichols testified that the trend in this country is actually away from using digoxin, and this is supported further by both evidence in the record and the discussion in the amicus brief filed by the American Medical Association that there are no established health benefits for digoxin, yet we know that there are known risks and that this is an invasive procedure which is not used prior to 18 weeks. As to the other two methods that the State is advocating for, again, although the State is attempting to argue that a number of the findings in the record are clearly erroneous and that the District Court ignored evidence or copied evidence from other cases, all of the facts in the District Court record are supported and are not clearly erroneous. And as to potassium chloride, the Court found that this is a rarely used procedure, that it is not used in outpatient abortion settings, that it takes a highly specialized training to accomplish, and indeed the evidence and the studies relied on show that it is primarily performed in a hospital setting. So the District Court's finding, and certainly in the time since the Gondolas decision, we do not see potassium chloride being used in the outpatient abortion setting. And the same is true with umbilical cord transection. The District Court properly found that the physicians in Texas are not using it. One physician testified that she has attempted umbilical cord transection and that it's not always possible. But the medical risks associated with umbilical cord transection are only part of the problem that we see with not only umbilical cord transection, but also potassium chloride and digoxin, which is all of these methods fail to cause demise in some circumstances, leaving the woman and the physician in a completely untenable position of having to undertake some kind of second demise procedure, which is totally untested and unstudied. And I think the District Court rightfully found would be experimental, as would digoxin, prior to 15, or prior to 18 weeks. I'd like to address um . . . What do you say about your opponent's statement that, as I understood it, that these methods are not experimental anymore. They have been proven, which is surprising to me. Oh, Your Honor, I'm sorry, are you finished with your question? Yes. Okay. So, here's the way in which these procedures remain experimental under what the State is proposing that all women in Texas would have to endure. Digoxin, prior to 18 weeks, is not used to cause fetal demise and would be experimental. Umbilical cord transection, rarely used in a single flawed study that reports on its safety and efficacy. And potassium chloride, not used in outpatient abortion settings and requiring highly specialized training. And so, the State has really very little basis on which to make its broad assertion that these methods of demise are available for all of the affected gestational ages. And so, on this score, the District Court's findings of fact are well supported, where the District Court has found that digoxin, prior to 18 weeks, and umbilical cord transection, for example, would be experimental procedures. And surely, the Supreme Court's decision in Stenberg shows that this kind of a burden cannot be countenanced. And the decision in Gonzales adds further support to that. The State could advance its potential, its interest in potential life appropriately by barring a minority procedure that was uniquely akin to infanticide. But it did not suggest, and in doing so, refer to the availability of a common method of abortion, specifically referring to the very D&E procedure that the State is attempting to prohibit here. The Court's reference to commonly available procedures was not forcing women to undergo invasive and medically unnecessary demise procedures in every case. And the State's attempt to twist that language to say that it is appropriate to force women to undergo invasive, unnecessary medical procedures that carry known risks is simply unsupported by the Court's analysis in Gonzales. I'd like to turn for a moment, if I may, to the State's assertions that findings of the District Court are clearly erroneous. The State is, in effect, attempting to re-litigate this case on appeal and undermine the District Court's findings and therefore its ultimate conclusion regarding the fact that this law imposes an undue burden. The importance of the District Court's role in assessing the evidence was underscored by the Supreme Court in the Whole Woman's Health decision. Here, the District Court faithfully executed its role as a fact finder by considering the record as a whole, observing the demeanor and credibility of the witnesses, and carefully considering the competing expert testimony. From this, the District Court based its findings on what it concluded was the greater weight of credible evidence. While the State may not agree with the District Court's resolution of contested issues of fact, the record fully supports the District Court's findings and the State has failed to meet its burden of showing that any of those findings are clearly erroneous. The State's arguments that the District Court overlooked or ignored evidence or simply copied facts from other cases really amounts to nothing more than disagreement with the Court's ultimate findings. The State would have this Court reverse those findings based on nothing more than its desire to have those facts decided differently. This, of course, falls far short of the demanding, clearly erroneous standard, which requires a reviewing court to reach a definite and firm conclusion that a mistake has been committed, a burden even more difficult to satisfy, whereas here, the District Court's findings are based in part on credibility determinations. All of the facts that the State asserts are clearly erroneous are supported by the record and correctly decided. Where the State sees error, the consistency between the District Court's finding here and those of other courts, including findings approved by the Eleventh Circuit in the Alabama case, support the conclusion that these facts are not clearly erroneous. And I'd like to take three examples to show how far short the State has, the State falls in supporting its clearly erroneous arguments. First, the State claims that the District Court erred by failing to find that suction can be used to cause fetal demise procedures before 17 weeks. As I mentioned, the District Court found that at 15 weeks and sometimes sooner, physicians often perform D&E procedure that is the most commonly used method of abortion after approximately 15 weeks. Testifying physicians made clear that they perform D&E rather than relying on suction when they believe that that is best for their fetus. Importantly, that suction alone cannot be used for all procedures before 17 weeks. The State not only ignores this evidence, but as with its other proposals, suggests medical practices inconsistent with the standard of care. Second, the State relies heavily on its claims that there were no complications. I've already addressed why that finding is fully supported by the record, but that is another example where the State falls far short of establishing that a fact is clearly erroneous. And third, the State faults the District Court for finding that at these gestational ages, the umbilical cord is approximately the size of a piece of yarn. This argument, as other arguments made by the State, overlooks the District Court's more critical findings that umbilical cord transection is experimental, not always possible, and carries significant health risks, including perforation, hemorrhage, and infection. Moreover, the State's own expert, Dr. Berry, testified that the umbilical cord at these gestational ages is one-half to one centimeter in diameter. The District Court did not err in analogizing that to a piece of yarn. In each instance, it is the State, rather than the District Court, that is failing to take into account the record as a whole. Its skewed presentation of incomplete facts does not provide a basis for concluding that any of the District Court's findings here are clearly erroneous. I'd like to now turn to the Stenberg decision. In Stenberg, the evidence before the Court addressed the same three methods of fetal demise that the State relies on here, injection with either potassium chloride or digoxin, or umbilical cord transection. That evidence was similar to the record here in that it showed that digoxin was not used for all D&E procedures, in that case not before 20 weeks, and that the injections carried appreciable maternal health risks. The evidence further showed, as does the record here, that umbilical cord transection is not always possible and also subjects women to medical risks. The Supreme Court held that the law imposed an undue burden on women seeking second trimester D&E procedures and granted facial relief. The law issue in Stenberg and SB-8 prohibit virtually the same conduct. Here, however, the evidentiary record more fully explains why the State's proposed methods of fetal demise are not feasible and, in fact, impose undue burden on women seeking D&E abortions. On this record, and looking to Stenberg for guidance, the District Court correctly held SB-8 unconstitutional. Ms. Hacker, in the State's briefing and also this morning, she discusses the District Court's, um, she called it improper, the sameane kind of borrowing, if that's the right word, I don't know, of, that it reached factual conclusions by sameane to borrow facts from other, um, courts with different factual records rather than the factual record in front of the court in this, in this case. She called it improper. What do you say? I say that, um, a review of the record before the District Court shows support for all of the findings of fact. And as the example I just used, um, illustrates where the State is saying the court improperly borrowed, um, the description of umbilical cord transsection as the width of a piece of yarn. There is, in fact, evidence in the record that supports that finding. Um, and I think that is true of, of the other findings. For example, umbilical cord transsection being experimental, um, the court had this very similar evidence that it's not routinely used, not always possible, and that only one study even addresses, um, the safety and efficacy of umbilical cord transsection. The State argues that under Gonzales, it can force demise procedures on all women seeking D&E based on its characterization of the procedure as brutal and gruesome. This argument fails for three reasons. First, under the balancing test required by Home Women's Health, the State failed to show that any of its asserted interests are meaningfully furthered. Second, Stenberg makes clear that these interests are not strong enough to support a ban on D&E procedures. And third, the court, the State is misreading Gonzales, where the court, as I noted, found that the State could permissibly further its potential interest, its interest in potential life, um, by banning a minority procedure akin to infanticide. But the court did not similarly, a similar description of the D&E procedure and still found that a ban on that procedure was an undue burden. All right. Thank you. Thank you. All right. We're back to you, Ms. Sackofer-Rebeau. Thank you. The plaintiffs spent their time telling you how risky this procedure is, how invasive it is, how it has no medical benefit, but they never explained why, if that was true, why they are subjecting their own patients to it and telling them that it is safe. Why are the plaintiffs performing this procedure on their patients when they're under no obligation to if it was as risky or dangerous as they claim it is? The answer is that it's not. This procedure is safe. They tell their patients it's safe and it is safe based on the evidence in the record. A couple of points of clarification. The plaintiffs claim that the State has fabricated the suction argument. As a point of clarification first, the State is not arguing that the procedure has to be performed with suction alone. That is not in the text of the statute and that is never what the State has been arguing. What we're saying is that the suction can be used to cause fetal demise. And where we get that from is not made up out of thin air. We got that out of the mouth of Dr. Amna Dermish, which is a law up to 17 weeks just by using suction to cause fetal demise. It does not violate SB 8 for a doctor to use suction to cause fetal demise and then remove whatever parts are left over inside the woman with forceps. That does not violate the law. The second source for that information comes from an abortion textbook co-authored by the plaintiff's expert in the case that suction can be used to cause fetal demise up to 17 weeks. The plaintiffs came up with various justifications as to why all of these claimed complications that they're saying weren't reported to the State. Abortion providers are obligated to report complications to the State. If they are not reporting complications, that's giving an inaccurate picture as to how safe the abortion procedure is safe. The facts are there are no reported complications related to digoxin. There were no reported complications of extramural delivery. Going to another point that they made, they said that digoxin is used after 18 weeks. That's generally true that that is when most doctors use it. They use it to cause a live birth, which really becomes an issue at 18 weeks. But that doesn't mean that they can't use it beforehand. There was evidence in the record of studies performed going down to 15 weeks. As I already mentioned, Planned Parenthood was using it at one affiliate as low as 13 weeks. And if we're talking about suction being able to be used to cause fetal demise up to 17 weeks and even giving them that digoxin is regularly used at 18 weeks, we're only talking about 17 to 18 weeks as maybe a potential gray area, crediting all of their arguments. I would direct the Court's attention to the actual size fetal diagrams in the record at 4273 and 4275. The Court can look for itself and compare the difference between an 18-week fetus and uterus and a 17-week fetus and uterus. There's barely any difference. There's no reason why a procedure that they acknowledge is safe until their patient is safe at 18 weeks would not be able to be used at 17 weeks, especially when there's evidence in the record that that's been studied. The plaintiffs are trying to create the rule from the exceptions. There has been no, even in her argument and in the record, there has been no evidence that the number of women that they claim would be unable to receive an abortion. We don't know how many that is. What we do know is that if the theoretical risk of that would be extremely low, that is not enough to support a facial challenge in this case. There's no evidence that prohibiting the barbaric practice of live dismemberment abortions, which involves tearing a live human fetus on the cusp of viability apart piece by piece, will prevent any woman in Texas from receiving an abortion, much less a large fraction of women. SB 8 is a modest restriction that serves the state's important interest in respecting the dignity of human life and still allows for pre-viability abortion in compliance with Supreme Court precedent. The District Court's erroneous decision should be reversed. Thank you. All right. Thank you, Ms. Hacker. Thank you to all counsel involved in the case for the briefing and the argument in the case. The case will be submitted and we will work our way through the record as well as your arguments and get it decided as best and as soon as we can. Thank you. All right. This concludes the orally argued cases on our docket for today. The panel will stand in recess until 9 a.m. in the morning.